# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00448-CR

**Chaka Romain Johnson, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT
NO. 8127, HONORABLE JOE CARROLL, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Chaka Johnson was indicted for the capital murder of Hidi Gower. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003) (defining murder), § 19.03(a)(3) (West Supp. 2009) (explaining that person commits capital murder when he commits crime for promise of remuneration). The jury found Johnson guilty, and Johnson was sentenced to life in prison. On appeal, Johnson challenges the legal and factual sufficiency of the evidence supporting his conviction. Johnson also alleges that the district court erred by failing to excuse a venireperson for cause and by failing to instruct the jury that one of the witnesses was an accomplice witness as a matter of law. We will affirm the judgment of the district court.

## BACKGROUND

This case arises from an alleged conspiracy to kill Hidi. Because it is helpful to the resolution of the issues on appeal, we will provide a summary of the parties involved in the events

leading to the death of Hidi. This summary comes from the testimony that was given at trial and from the exhibits that were admitted during the trial.

Starting in 2005, Regina Edwards became romantically involved with Don Gower. Eventually, Edwards and Don[1] got engaged, and Edwards moved into Don's home. In 2006, Don temporarily moved to Kansas for work purposes. After Don had been in Kansas for some time, he called Edwards and broke off their engagement. Further, he told Edwards that he had remarried his former wife Hidi. After learning that Don had remarried and that he and Hidi were moving back to Texas, Edwards moved out of the home that she and Don had shared. When Don was transferred back to Texas, he and Hidi moved into his home.

Although Edwards moved out of the home, she and Don remained friends.[2] In March 2007, Don told Edwards that he wanted to have Hidi killed. In addition to telling Edwards, Don also mentioned his desire to have Hidi killed to his friend Jeremiah Ellison. In fact, Don offered Ellison $25,000 to kill Hidi, but Ellison turned down the offer. When Ellison refused, Don asked Ellison if he knew anyone who would be willing to do the job. Around that same time, John Martinez contacted Ellison to see if Ellison would sell him some cocaine. Because Ellison knew that Don was selling cocaine, he arranged a meeting between Don and Martinez. After Martinez purchased drugs from Don, Don offered Martinez $25,000 to kill Hidi. Don explained that the money would come from a life-insurance policy that he had taken out on Hidi.

---

[1] Because Don and Hidi share the same last name, we will refer to each by their first names.

[2] In her testimony, Edwards denied continuing a romantic relationship with Don after he remarried Hidi, but the testimony from other witnesses and various exhibits indicate that they were romantically involved during the months leading up to Hidi's death.

When he formulated a plan for killing Hidi, Don originally considered having Hidi killed in the parking lot where she worked. Don mentioned the parking-lot idea to Edwards and stated that he did not think that there were any video cameras in the lot, but Edwards said, "There's cameras everywhere." After Don told Martinez about the parking-lot idea, Martinez drove to Hidi's work to see if that plan could work, but he concluded that the parking lot was not a good location because there were always people in the parking lot when Hidi finished work.

After Martinez rejected Don's first suggestion, Don formulated a different plan. Specifically, Don thought that the killer should hide in Hidi's car and then wait for an opportune moment to kill Hidi. In furtherance of that plan, Don took a set of Hidi's car keys and gave them to Ellison so that Ellison could give the keys to Martinez. Ellison told Martinez that Don had given him the keys to the car, and Ellison placed the keys outside the front entryway to his apartment so that Martinez could pick them up without entering the apartment. Late that same evening, Martinez drove to Ellison's apartment and picked up the keys. Some time after getting the keys, Martinez placed them in his girlfriend's purse. Martinez's girlfriend's name was Mariah Epperson.

In March 2007, Martinez told Ellison that he needed to get money from Don in order to buy a gun. After Martinez mentioned needing a gun, Ellison attempted to locate a gun to purchase, but he was unsuccessful. Because Ellison was unsuccessful, Martinez made arrangments to purchase a gun. When Martinez went to buy the gun at the agreed location, Ellison accompanied him, and Don and Edwards drove there separately. Don paid $250 for the gun, but Martinez kept the gun. The individual who sold the gun wrapped the gun in a towel and also gave Martinez some ammunition.

3

A few weeks before July 2007, Ellison moved out of his apartment, and he and his girlfriend moved into Don and Hidi's home. Some time after Ellison moved in, Don came up with a new plan for killing Hidi. Don decided that the best time to kill Hidi would be on July 4 at the local VFW where he and Hidi had planned to play pool that night. Essentially, Don planned to park his truck in the back of the parking lot and then ask Hidi to retrieve something from the truck around the time that the fireworks were starting to go off. Don wanted the murderer to wait for Hidi at the truck and hoped that the sounds of the shots would be muffled by the fireworks.

On July 2, 2007, Don and Ellison went to Martinez's hotel room, and Don told Martinez that he had to either return the gun or the money that was used to purchase the gun. Martinez said that he would return the gun but had to wait until the next day because the gun was at his girlfriend's house. Ellison returned to Martinez's hotel room the next day in order to retrieve the gun and told Martinez about the new plan. At that time, Don was frustrated with Martinez because he had not made any attempt to kill Hidi. For that reason, Don had renewed his prior request to Ellison that Ellison be the one to kill Hidi, but Ellison still did not want to. Because Ellison did not want to shoot Hidi, Martinez offered to help find an individual who would agree to do the job, but he and Ellison were unable to find anyone willing to go through with it.

A few days before Ellison went to Martinez's hotel room, Edwards received a phone call from Johnson (appellant). Johnson and Edwards had been involved in an on-again, off-again romantic relationship before she started dating Don in 2005. The relationship had lasted for years, but it ended when Johnson was sent to prison. Shortly after Johnson was released, he called Edwards and asked her to come pick him up, and she brought him to her house. While Johnson was staying

4

with her, Edwards became romantically involved with Johnson again. In addition to knowing Edwards, Johnson was also friends with Ellison and called Ellison when he was released from prison. In the days leading up to July 4, Johnson and Ellison spent a lot of time together.

On July 4, Ellison went to Edwards's home to socialize with Johnson. Johnson had also invited another friend named Fred Mosby. At some point during the day, Johnson, Ellison, and Mosby left Edwards's home to meet up with Martinez at his hotel room. Eventually, the four of them got into Martinez's girlfriend's (Epperson's) car and drove around the VFW. After finishing their drive, the four went to Edwards's home. Edwards had planned on going to see the fireworks show, but shortly before the show started (approximately 8:00), Johnson, Ellison, and Martinez left Edwards's home again and drove off in Epperson's car. After leaving Edwards's home, Johnson and Martinez drove to Don's home and dropped Ellison off. While Johnson and Martinez were dropping Ellison off, Mosby and Edwards went to watch the fireworks show.

Around the same time that Johnson and the others left Edwards's home, Don was driving Hidi to the VFW. After playing pool for a little while, Don asked Hidi to retrieve something from his truck on two separate occasions. Hidi did not return after heading out to the truck for the second time. After noticing Hidi's long absence, several of the individuals inside the VFW expressed concern for Hidi. Don attempted to deflect their concerns by saying that Hidi was "probably on her phone." Eventually, another patron at the VFW insisted on going outside to check on Hidi, and Don begrudgingly agreed to accompany him. The patron found Hidi lying beside Don's truck. She had been shot several times, including a couple of shots to the head. One of the individuals inside the VFW called 911, and emergency personnel responded. Hidi was taken to the hospital but died shortly after arriving.

5

After the fireworks show concluded, Edwards and Mosby returned to her home. Martinez dropped Johnson off at Edward's home shortly after Edwards got back from the show. On July 5 (the day after the shooting), Johnson, Mosby, Martinez, and Epperson all met up at Edwards's house to watch movies.

During his investigation of the death of Hidi, Texas Ranger Jesus Ramos had several conversations with Edwards. In one of those conversations, Edwards confessed to knowing about the plan to kill Hidi and identified several people who had been involved in the crime. After obtaining the names of the individuals potentially involved, the police went to Epperson's work to look for Martinez. The police saw Martinez drive up in Epperson's car, informed Epperson that her car might have been used during the commission of a crime, and asked for permission to search her car. Epperson agreed, and the police searched her car. The police found a gun wrapped in a towel and ammunition inside the trunk. Tests performed on the gun linked the gun to the discharged ammunition that was used in the crime.[3]

Ultimately, the police arrested Martinez, Johnson, Don, and Ellison. After the police concluded their investigation, Johnson was charged with capital murder. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(3). Specifically, the indictment alleged that Johnson "intentionally or knowingly" caused the death of Hidi "for remuneration or the promise of remuneration from" Don.[4]

---

[3] A set of keys to Hidi's car were found in Epperson's purse. Epperson told the police that Martinez put the keys in her purse and told her to not worry about them when she asked whose they were.

[4] The language of the indictment tracks the language found in the penal code provisions defining murder and capital murder. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003), § 19.03(a)(3) (West Supp. 2009).

During Johnson's trial, Edwards, Martinez, Ellison, Epperson, Mosby, Ranger Ramos, witnesses who were at the VFW on July 4, two of Johnson's friends, and Edwards's landlord all testified. The jury charge instructed the jury that Ellison and Martinez were accomplices to the crime as a matter of law but left it to the jury to determine whether Edwards was an accomplice to the crime. The jury found Johnson guilty, and the district court imposed a life sentence on Johnson. Johnson appeals his conviction.

## DISCUSSION

Johnson raises four issues on appeal. In his first two issues, he asserts that the evidence is legally and factually insufficient to support his conviction. In his third issue, Johnson argues that the district court erred by failing to instruct the jury that Edwards was an accomplice as a matter of law. Finally, Johnson contends that the district court erred by failing to excuse a potential juror for cause. We will address Johnson's last issue first. We will also address his third issue before addressing his sufficiency arguments because the resolution of the third issue bears upon the sufficiency of the evidence.

*Challenge for Cause*

In his fourth issue on appeal, Johnson asserts that the district court erred by refusing to excuse venireperson 22 for cause.[5] Johnson contends that the venireperson should have been

---

[5] To preserve a challenge-for-cause issue, "an appellant must demonstrate on the record that: 1) he asserted a clear and specific challenge for cause; 2) he used a peremptory challenge on the complained-of venireperson; 3) all his peremptory challenges were exhausted; 4) his request for additional strikes was denied; and 5) an objectionable juror sat on the jury." *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002); *see also* Tex. R. App. P. 44.2(b) (explaining that nonconstitutional errors must be disregarded unless they affect defendant's substantial rights).

excused for cause because she had improper knowledge of extraneous misconduct previously committed by Johnson. The venireperson at issue worked at the Community Supervision and Corrections Department, which managed Johnson when he had been placed on community supervision for a prior offense. During voir dire, the venireperson informed the district court that she was familiar with Johnson through her work. Although she stated that she did not directly manage Johnson, she admitted that she did know why Johnson was placed on probation.

Relying on the prohibition against allowing biased individuals to serve as jurors, Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (West 2006); *see Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999), the statute prohibiting a defendant's prior convictions from being read to the jury during the guilt/innocence stage of a trial if the offenses are alleged for punishment enhancement purposes only, Tex. Code Crim. Proc. art. 36.01(a)(1) (West 2007), and the presumption of innocence, *id.* art. 38.03 (West Supp. 2009), Johnson argues that the venireperson's knowledge of "a possible conviction" required her removal for cause.[6]

---

Johnson asked the district court to dismiss the venireperson for cause, but the district court denied that request. Johnson then used one of his peremptory challenges to dismiss her. After exercising his peremptory challenge, Johnson asked the district court to grant him one more peremptory challenge. When asking for an additional challenge, Johnson stated that he wanted to use a peremptory challenge to excuse juror 1 but was unable to because he had used all of his peremptory challenges. The district court denied that request.

[6] Alternatively, Johnson asserts that his conviction should be reversed because venireperson 22 had an "implied bias" as a matter of law. After noting that a concurring opinion to a Supreme Court decision stated that "there are some extreme situations that would justify a finding of implied bias," *see Smith v. Phillips*, 455 U.S. 209, 222-23 (1982) (O'Connor, J., concurring), Johnson then argues that the circumstances in this case rise to the level of "implied bias" because the venireperson's knowledge of his prior misconduct made "her a *de facto* witness in this case." *Cf.* Tex. Code Crim. Proc. Ann. art. 35.16(a)(6) (West 2006) (stating that juror may be excused for cause if "the juror is a witness in the case").

When reviewing a district court's denial of a challenge for cause, we give great deference to the trial court's ruling, *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002), and only overrule the determination if the district court abused its discretion, *id.* at 747; *Ladd*, 3 S.W.3d at 559. A district court abuses its discretion if it acts outside the zone of reasonable disagreement. *See McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007). In other words, if reasonable individuals can disagree about the decision, an appellate court should not reverse the district court's determination. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

While it is true that a venireperson may be challenged for cause if he has a bias in favor of or against the defendant, *Laca v. State*, 893 S.W.2d 171, 181 (Tex. App.—El Paso 1995, pet. ref'd), the venireperson can serve if he "can put aside any bias, prejudice, or conclusion of guilt and base his verdict on the evidence," *Wright v. State*, 866 S.W.2d 747, 751 (Tex. App.—Eastland 1993, pet. ref'd). Although venireperson 22 admitted that she was aware of why Johnson had been placed on community supervision, she also stated that her prior knowledge would not affect her decision making if she were selected for jury service. Moreover, as the person alleging a challenge

However, Johnson's reliance on that concept is misplaced. That concept has only been described as applying to situations in which it is discovered that a juror failed to disclose relevant information during voir dire and served on the jury. *See Smith*, 455 U.S. at 222-23 (O'Connor, J., concurring) (listing situations in which implied bias might be present, including "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction"); *Solis v. Cockrell*, 342 F.3d 392, 395-98 (5th Cir. 2003) (describing cases that have discussed doctrine of "implied" or "presumed" juror bias when juror fails to disclose material information); *see also Andrews v. Collins*, 21 F.3d 612, 620 (5th Cir. 1994) (noting that Supreme Court has not adopted doctrine of implied bias). In this case, the venireperson disclosed the relevant information during voir dire and was not seated on the jury.

9

for cause, Johnson had the burden of establishing that the challenge was proper. *Feldman*, 71 S.W.3d at 747. Other than ascertaining that the venireperson did not supervise Johnson, that she knew why Johnson was on probation, and that the knowledge would not influence her decision, Johnson made no additional inquiries regarding the nature of the venireperson's knowledge or alleged bias. *See id.* (explaining that burden is not met unless proponent shows that venireperson understood law but "could not overcome his prejudice well enough to follow it").

In light of the preceding, we cannot conclude that the district court abused its discretion by refusing to discharge venireperson 22 for cause because the district court could have reasonably concluded that the venireperson would follow the law and would have afforded Johnson the presumption of innocence. *See Ladd*, 3 S.W.3d at 560 (explaining that law only requires that jurors be open-minded and persuadable). Accordingly, we overrule Johnson's fourth issue on appeal.

*Accomplice Witness*

In his third issue on appeal, Johnson contends that the district court erred by failing to conclude that Edwards was an accomplice witness as a matter of law and by failing to instruct the jury accordingly. As described earlier, the district court instructed the jury that Ellison and Martinez were accomplice witnesses as a matter of law, but the court instructed the jury that it should make the determination of whether Edwards was an accomplice witness. Johnson argues that the district court's decision to allow the jury to make the determination regarding Edwards was error. Moreover, in light of the statutory prohibition against allowing a defendant to be convicted based on "the testimony of an accomplice unless corroborated by other evidence tending to connect the

10

defendant with the offense committed," Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005), Johnson asserts that the district court's failure to give the instruction allowed the jury to convict him based on uncorroborated evidence in violation of the statutory prohibition. *See Reyna v. State*, 22 S.W.3d 655, 658 (Tex. App.—Austin 2000, no pet.) (explaining that corroborating evidence is needed for accomplice-witness testimony due to witness's incentive to try and "deflect blame and punishment from himself" and to "falsely implicate others in his crime"); *Cathey v. State*, 992 S.W.2d 460, 463 n.4 (Tex. Crim. App. 1999) (stating that accomplice-witness rule stems from legislative determination that accomplice testimony should be viewed with skepticism); *see also* Tex. Code Crim. Proc. Ann. art. 38.14 (stating that "the corroboration is not sufficient if it merely shows the commission of the offense").

An accomplice witness is one who *could* "be prosecuted for the same offense with which the accused is charged," *Reyna*, 22 S.W.3d at 658; *see Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987), or a lesser included offense, *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). If the "witness has no complicity in the offense for which an accused is on trial," then he is not an accomplice witness. *Gamez*, 737 S.W.2d at 322. Whether the person "is actually charged and prosecuted" for the crime is irrelevant, but there must be sufficient evidence linking the witness "to the criminal offense as a blameworthy participant." *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998).

When there is evidence showing that a witness may be an accomplice witness, the trial court may provide one of two types of instructions to the jury. *See Paredes*, 129 S.W.3d at 536. If the evidence clearly shows or there exists no doubt that the witness is an accomplice witness, then

11

the trial court should instruct the jury that the witness is an accomplice witness as a matter of law. *Blake*, 971 S.W.2d at 455; *see Paredes*, 129 S.W.3d at 536 (stating that court has no duty to provide instruction unless evidence is clear). On the other hand, if the evidence is conflicting and does not clearly demonstrate that the witness is an accomplice, then the determination regarding whether the witness is an accomplice witness is a matter of fact, and the trial court should instruct the jury to determine whether the witness is an accomplice witness. *Blake*, 971 S.W.2d at 455.

In support of his assertion that the district court should have concluded that Edwards was an accomplice as a matter of law, Johnson points to various pieces of evidence and testimony that were presented during the trial.

First, Johnson notes that Edwards was arrested and initially charged with Hidi's murder. However, the testimony from Edwards and Ramos reveals that the charges against Edwards were later dropped. Moreover, just as the decision to not charge a witness is not dispositive of whether he is an accomplice witness, *see id.*, it would seem to logically follow that the fact that a witness is charged with the crime would not be dispositive when the charge is later dropped.

Next, Johnson refers to the testimony of various witnesses indicating that Edwards was aware of the plot against Hidi. For example, Edwards herself testified that Don had told her that he wanted someone to kill Hidi because "she was lazy," "didn't cook," and "didn't clean." Similarly, Edwards testified that Don talked about his plans to have Hidi killed in the parking lot where she worked and at the VFW and to arrange Hidi's death by giving the potential murderer her car keys so that he could sneak into her car. In her testimony, Edwards also admitted that she knew that Don and Hidi were going to the VFW on July 4. Furthermore, Edwards stated that Don

12

informed her that Martinez had agreed to kill Hidi and then later informed her that he was just going to kill Hidi himself. Edwards also mentioned that Don told her that he had purchased an insurance policy for Hidi. Further, Ellison testified that Don told him that Edwards wanted Hidi to die and that Johnson had said that Edwards told him about Don's desire to kill his wife. In addition, both Ellison and Martinez indicated in their testimonies that they thought Edwards knew details regarding the plan to kill Hidi.

As further proof that Edwards was aware of the plot against Hidi, Johnson refers to phone records detailing Edwards's communications with Don and to various text messages that she sent to or received from Don and that were admitted into evidence. When asked about Edwards's communication with Don, Ramos testified that shortly after Hidi's death, Edwards and Don talked on the phone for almost three hours. The text messages Johnson points to relate to Hidi and were sent before the murder.[7] Those messages read, in relevant part, as follows:

> [From Don to Edwards]: I love you and the problem with The bitch will be done real soon for sure.
>
> [From Don to Edwards]: I love you with all my heart i will fix rent and hidi will be fixed this month one way or another . . But i got a bad feeling deep in side
>
> [From Don to Edwards]: We are a familey and i truley love all of you that is my dream
>
> [From Edwards to Don on July 4]: K, [Johnson] just got here, He called, I told him ya.ll were looking 4 him. He.s waiting 4 [Ellison][8]

---

[7] Many of the other texts were romantic in nature and indicate that Don and Edwards were involved in a relationship prior to Hidi's death.

[8] When questioned about the last text message, Ramos agreed that Edwards was facilitating communication between Don, Johnson, and Ellison.

Johnson also highlights the testimony from Edwards's landlord, Brandi Davis. In her testimony, Davis explained that in May 2007 Edwards introduced Don as her husband and that Don paid part of Edwards's monthly rent. Next, Davis testified that Edwards said that she and Don were "presently separated" but were renewing their vows and wanted to purchase Davis's house. When discussing the potential sale of her home, Davis clarified that Edwards said that Don was "getting ahold of some money very quickly" and that they wanted to purchase the home in July 2007.

Although the evidence highlighted by Johnson does indicate that Edwards was aware of the plot to kill Hidi, a person is not an accomplice witness simply because he knew of the crime but failed to disclose it or even if he concealed it. *See Gamez*, 737 S.W.2d at 322. On the contrary, to be an accomplice witness, the witness must have made some affirmative act in furtherance of the crime. *Bacey v. State*, 990 S.W.2d 319, 327 (Tex. App.—Texarkana 1999, pet. ref'd).

When describing what the police investigation of Edwards revealed about her involvement in the crime, Ramos testified that he was unable to conclude that Edwards actively participated in the killing. To the contrary, he stated that his investigation revealed that Edwards did not purchase or obtain any items that were used to commit the crime and did not drive any vehicle in furtherance of the crime. Furthermore, although a couple of witnesses insinuated that Edwards knew of the plot, no witness testified that Edwards actively participated in the plan. Moreover, as will be discussed more thoroughly in the next section, several witnesses testified that Johnson and Martinez drove around the VFW searching for the ideal spot to commit the crime and to meet up afterwards, but no witness ever testified that Edwards was present during those preparatory events or that she suggested that those actions be performed. Similarly, no witness testified that Edwards

14

was present when Hidi was killed. In fact, Edwards testified that she was watching the fireworks with Mosby at the time of Hidi's death, and that assertion was confirmed by Mosby.

Edwards also denied encouraging anyone to commit the offense and stated that she did not provide any aid in committing the offense. Although Edwards admitted that Don discussed his plan to kill Hidi with her, Edwards also repeatedly testified that she thought Don was "just talking" and that she did not take him seriously. In fact, Edwards testified that on July 4 she thought that Johnson was going to watch the fireworks with her. Further, she stated that Don often discussed "weird" topics and had expressed his hope that other people would die as well. That assertion was confirmed by the testimony of Jennifer Ellison, who was married to Ellison at the time of the trial. Jennifer testified that Don and Ellison had discussed killing several people, including Hidi.

Finally, Johnson refers to evidence that he asserts shows that in addition to knowing of the plan, Edwards helped to facilitate the plan. In particular, Johnson points to a comment that Edwards made to Don that Edwards discussed during the trial.[9] During the exchange, Don said that he wanted to kill Hidi where she worked, but Edwards said that because it was a business, there would be "cameras everywhere." Based on that comment, Johnson contends that Edwards actively aided the commission of the offense by helping to choose a location for the offense. In addition to this comment, Ellison, Martinez, Edwards, and Ramos all testified that Edwards was present when Martinez purchased the gun that was used in the crime.

Although the testimony indicates that Edwards was present when the gun was purchased, an individual does not become an accomplice witness simply through his or her presence.

---

[9] Ramos also testified that Edwards mentioned her comment to the police when she gave her statement.

15

*See Gamez*, 737 S.W.2d at 322. Further, Ramos testified that the investigation failed to prove that Edwards was actually aware that a gun was being purchased at the time of the exchange, and Edwards stated that she did not see the exchange.

Regarding Edwards's discussion of the likelihood that there were cameras in the parking lot of Hidi's work, Ramos testified that he could not conclude that the statement facilitated Hidi's murder. Furthermore, evidence was presented during the trial indicating that Don decided against killing Hidi at her work for reasons other than the possibility that there may have been cameras filming the parking lot. Specifically, Edwards and Martinez both testified that Martinez told Don that it was not a good idea to attempt to kill Hidi in the parking lot of her work because there was always someone in the parking lot when Hidi got off work.

In light of the conflicting nature of the evidence pertaining to whether Edwards was an accomplice witness, we cannot conclude that the district court erred by concluding that the determination regarding whether Edwards was an accomplice witness was a matter of fact for the jury to decide or by instructing the jury accordingly. *See Green v. State*, 72 S.W.3d 420, 424 (Tex. App.—Texarkana 2002, pet. ref'd) (noting that even when evidence "shows more likely than not that the witness is an accomplice as a matter of law," jury should make determination regarding whether individual is accomplice witness). For these reasons, we overrule Johnson's third issue on appeal.

*Sufficiency of the Evidence*

In his first two issues on appeal, Johnson contends that the evidence is legally and factually insufficient to support his conviction. Specifically, Johnson contends that Edwards was

16

an accomplice witness and that her testimony cannot properly corroborate other testimony and evidence that was introduced. Further, Johnson argues that without Edwards's testimony, the evidence is legally and factually insufficient to support Johnson's conviction. Irrespective of whether Edwards was an accomplice witness, we conclude that there is legally and factually sufficient evidence.

When evaluating whether the evidence is legally sufficient, courts "must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Williams v. State*, 301 S.W.3d 675, 683-84 (Tex. Crim. App. 2009). The trier of fact is entitled to determine what weight to give any particular piece of evidence, to resolve conflicts in the evidence, and to evaluate the credibility of the witnesses. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

Unlike for legal-sufficiency reviews, in factual-sufficiency determinations, all of the evidence is considered in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). When performing this analysis, courts bear in mind that the fact finder is the sole judge of the weight and the credibility of the evidence presented. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *see also* Tex. Code Crim. Proc. Ann. art. 36.13 (West 2007) (explaining that "jury is the exclusive judge of the facts"). Under a factual-sufficiency review, a reversal is not warranted simply because the appellate court has "a subjective level of reasonable doubt." *Watson*, 204 S.W.3d at 417. Rather, the judgment may only be set aside if (1) the evidence is "so weak that the jury's verdict seems clearly wrong and manifestly unjust," or (2) the verdict is "against the great weight and preponderance of the evidence." *Id.* at 414-15.

17

During the trial, Ramos testified that there was no physical evidence linking Johnson to the gun that was used to kill Hidi.[10] Similarly, Ramos explained that there was no evidence that Johnson became aware of the plot to kill Hidi prior to a few days before the shooting. However, Ellison, Edwards, and Martinez all provided testimony implicating Johnson as the shooter.[11]

When he was called to the stand, Ellison testified regarding events that occurred before and after the shooting. In particular, Ellison explained that on July 4 he went over to Edwards's house to hang out with Johnson and that Johnson asked him about the plan to kill Hidi. Further, Ellison stated that he told Johnson that Martinez was supposed to kill Hidi at the VFW and that after hearing the plan, Johnson suggested that they go meet with Martinez. Ellison also testified that after meeting up with Martinez, the three of them and Mosby drove to the VFW to examine the lay out and to look for places to meet after Hidi was shot. In addition, Ellison related that during the car ride, Martinez told Johnson that Johnson could hide in the bushes near the VFW after the shooting.

Regarding what happened after they drove to the VFW, Ellison testified that all four of them went back to Edwards's home. Further, Ellison stated that once they returned, Johnson asked to borrow some clothing from him. Specifically, Ellison testified that Johnson asked to borrow a hoodie. Ellison also related that after Johnson made the request, Martinez and Johnson

---

[10] The only fingerprint recovered from the gun belonged to a woman, but the identity of that woman was never determined.

[11] During his testimony, Ramos stated that while Don was in jail, Don wrote a note stating that Edwards was the shooter. However, all of the other evidence pertaining to Edwards's whereabouts at the time of the shooting demonstrate that Edwards was watching the fireworks show when Hidi was shot.

18

drove him to Don's house (where he was staying) so that he could look to see if he had any clothes that Johnson could borrow. When describing the types of clothes that he gave to Johnson, Ellison stated that he gave Johnson a blue sweatshirt and some K-swiss sneakers. In his testimony, Ellison also stated that after he gave Johnson the clothes, Martinez and Johnson drove off and left him at Don's house and that he stayed at Don's home until 10:00 p.m. that evening when Johnson called him and told him to go back to Edwards's house. In addition, Ellison explained that once he arrived at Edwards's house late that evening, Johnson said, "Hey, it's done." Further, Ellison related that when he saw Johnson the next day, he heard Johnson ask Martinez if he had gotten rid of the gun and that Martinez said that the gun was still in Epperson's car. Finally, Ellison testified that on the day after the shooting, Johnson mentioned that he wanted to talk to Don about getting paid for completing the job.

After Ellison testified, Martinez took the stand and related his recollection of the events leading up to and occurring after the shooting.[12] Much of Martinez's testimony was consistent with Ellison's testimony. Specifically, Martinez testified that on July 4 he, Johnson, Ellison, and Mosby all drove by the VFW in Epperson's car. Further, Martinez explained that after driving past the VFW, the four of them drove to Edwards's house. Then, Martinez related that he, Ellison, and Johnson all left to go to Don's home so that Johnson could borrow some of

---

[12] During the testimony of both Martinez and Ellison, Johnson's attorney questioned them about the possibility that either of them had been offered a deal for their testimony. When asking those questions, the attorney read from a portion of a letter written by the district attorney stating that if Martinez and Ellison testified, the State "would take that into consideration in making a determination in their case and that anything that they . . . testified to, after their attorneys became involved, would not be used against them in court if they wanted a trial in their case[s]." That letter was admitted as an exhibit during trial.

19

Ellison's clothes. Martinez testified that Ellison brought Johnson a dark blue hoodie and K-swiss sneakers. After describing the clothes Johnson received, Martinez stated that Johnson changed into the clothes and that he and Johnson then left Don's home to go to the VFW but that Ellison remained behind.

In his testimony, Martinez also described events that occurred after Ellison was dropped off and before Ellison went back to Edwards's house. Specifically, Martinez stated that he and Johnson drove around the VFW looking for Don's truck and that he dropped Johnson off after finding the truck. Furthermore, Martinez explained that after he dropped Johnson off, he parked nearby and waited for Johnson to return to the car. Martinez stated that after hearing three loud sounds, he saw Johnson heading towards the car. In addition, Martinez related that after Johnson returned to the car, he said, "She's gone," and stated that he had shot Hidi three times in the chest and the head.

Martinez also testified that after Johnson shot Hidi, he and Johnson went back to his hotel room, that Johnson changed out of the clothes Ellison had given him, that he left Johnson in his hotel room when he went to pick up Epperson from work, and that he drove Johnson back to Edwards's house between 10:00 and 11:00 that night. Finally, Martinez explained that after he dropped Johnson off, he wiped the gun down, covered the gun with a towel, put the gun in the trunk of Epperson's car, and threw away the clothes that Johnson had borrowed from Ellison.[13]

Much of Martinez's and Ellison's testimony was corroborated by Edwards. In particular, she testified that Johnson, Ellison, and Martinez left her house together and that Johnson

---

[13] The clothes that Johnson allegedly wore when he shot Hidi were never recovered.

said that he would meet her and Mosby later to watch the fireworks. Next, Edwards explained that she did not see Johnson again until he showed up at her house about 10 minutes after she got home from watching the fireworks.

Moreover, she stated that Johnson had dirt on "his waist, back area, and . . . down by his ankles" and that when she asked Johnson where the dirt came from, he responded that he "ran across a field." In her testimony, Edwards also related that when she asked Johnson why he did not have dirt on his feet or shirt, Johnson said that Ellison had lent him a black hoodie and some tennis shoes. In her testimony, Edwards also recalled that she did not see any dirt on Martinez's or Ellison's clothing.

Regarding the shooting, Edwards testified that she walked in on a conversation between Ellison and Johnson in which Ellison said, "Don doesn't know it wasn't me." Further, Edwards stated that after she saw a story about Hidi's death on the news, she asked Johnson if he had killed Hidi and that he replied, "I needed the money."[14] Edwards also testified that Johnson told her to lie to the police and to tell them that he was watching fireworks with her that night.[15]

The testimony of Ellison and Martinez and the corroborating testimony from Edwards constitute legally and factually sufficient evidence to support Johnson's conviction. As mentioned previously, Johnson insists that Edwards was an accomplice witness and that, therefore, her testimony cannot properly serve as corroborating evidence. When the district court gave the jury an

---

[14] Edwards also related that Johnson told her that if he could figure out a way to get access to the money that Don was going to receive because of Hidi's death, he would kill Don too.

[15] We note that in her testimony, Edwards admitted that she was untruthful when she first gave a statement to the police. In particular, she admitted to misleading the police about her communications with Don after Hidi's murder. Edwards also stated that she lied to the police on more than one occassion because she was afraid of "retaliation."

21

accomplice-witness instruction regarding Edwards, the court instructed the jury to make the determination regarding whether she was indeed an accomplice witness, and we previously determined that the district court's decision was not error. Although the district court instructed the jury to make the determination, the judgment by the jury does not specify which way the jury decided on the issue of whether Edwards was an accomplice witness.[16] Even assuming for the sake of argument that the jury determined that Edwards was an accomplice, the conviction is still supported by legally and factually sufficient evidence because other evidence presented at trial also corroborates the testimony that Johnson shot Hidi.

When determining whether an accomplice witness's testimony is corroborated, appellate courts disregard the testimony of the accomplice and examine the remaining evidence. *Sexton v. State*, 51 S.W.3d 604, 611 (Tex. App.—Tyler 2000, pet. ref'd). To sufficiently corroborate an accomplice-witness's testimony, it is not necessary that the corroborating evidence directly connect the defendant to the crime or establish, on its own, the defendant's guilt beyond a reasonable doubt; on the contrary, the evidence need only tend to connect the defendant to the crime. *See Cathey*, 992 S.W.2d at 462; *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). There is no precise rule for how much corroborating evidence must be presented, and each case must be judged on its own facts. *Gill*, 873 S.W.2d at 48.

During the trial, various witnesses provided testimony tending to connect Johnson to the offense. For example, Chevele Fluelen, who is Mosby's sister, testified that the day before

---

[16] Although we need not determine whether Edwards was an accomplice witness, we note that a reasonable fact finder could have determined that Edwards was not an accomplice based on the evidence described in the previous issue. Accordingly, Edwards's testimony could properly corroborate the testimony of Ellison and Martinez.

the shooting, Johnson came by her house to visit. Further, Fluelen stated that during the visit Johnson seemed sad and that when she asked Johnson what was the matter, he replied that he had something to do that no one could talk him out of.[17]

In addition, Fred Mosby testified regarding events that occurred shortly before and shortly after Hidi was shot. Specifically, he stated that on the day Hidi was shot, he, Johnson, Ellison, and Martinez drove by the VFW. Although Mosby explained that he could not hear what Johnson and Martinez were discussing because he was in the back seat and because the radio was on,[18] Mosby related that after they finished driving, the four of them went to Edwards's home. Furthermore, Mosby testified that around the time that the fireworks show was supposed to start, Johnson, Ellison, and Martinez left Edwards's house again and that Johnson told Mosby to go to the show with Edwards. Finally, Mosby explained that Johnson, Ellison, and Martinez returned to Edwards's house after the show had concluded, which was after Hidi had been shot.

During the trial, Mariah Epperson, who was Martinez's girlfriend at the time of the incident, also testified. She explained that at around 9:00 p.m. on the night that Hidi was shot, Martinez picked her up from work and took her to his hotel room. Further, she explained that when she got to the room, she saw Johnson in the room and noticed a sweatshirt and shoes that did not

---

[17] During the trial, Johnson's attorney argued that Johnson might have been referring to the fact that his grandfather had died while he was in jail and that Johnson might have to sell some of the items that his grandfather had given him. The idea that Johnson's grandfather had left him some items was suggested by Fluelen and was also mentioned during the testimony of Sam Angel, who was one of Johnson's friends. Specifically, Angel related that prior to the shooting, Johnson asked him if he knew where to get some gun cleaner because Johnson had inherited some guns from his grandfather.

[18] Mosby testified that he thought they were just cruising around.

belong to Martinez. Epperson testified that when she asked about the clothes, Martinez said that the clothes were "evidence" and that Johnson laughed at Martinez's comment. Epperson also stated that later in the evening she saw Martinez wipe down a gun in his hotel room and then wrap the gun in a towel.

In addition to presenting testimony from individuals who knew Johnson or others involved in the conspiracy, the State also called a couple, Steven and Sara Doyle,[19] who did not know the individuals involved. At the time of the shooting, Steven and Sara were standing outside Steven's home, which was located near the VFW. In their testimonies, the couple described unusual behavior that they observed near Steven's home around the time of the shooting.

In his testimony, Steven stated that he was outside talking to Sara when he saw someone walking down the road in front of his house.[20] Steven explained that the individual was wearing a "blue sweat top," which he thought was unusual because it was hot on the night in question. Sara also testified that she saw an individual walking on the road between 8:30 and 9:00 p.m. that night, and she confirmed Steven's description of the individual's clothing. Specifically, she stated that the individual was wearing "a dark blue hoodie or a blue hoodie," which she thought was "pretty heavy for July in Texas." Both Steven and Sara related that the individual hid in the bushes when a car drove by.[21]

---

[19] Due to their shared last name, we will refer to the Doyles by their first names.

[20] During his testimony, Martinez explained that after he dropped Johnson off and parked, he saw a man and a woman standing outside and that he was concerned that the couple had observed Johnson return to the car.

[21] We mentioned previously that in his testimony, Ellison stated that Martinez told Johnson to hide in the bushes after shooting Hidi.

Steven and Sara also provided a description of the individual that they saw. In particular, Steven said that the individual was taller than 5'9" (Steven's height). Further, he testified that the individual was not white and had a dark complexion, but Steven admitted that he could not see the individual's facial features and could not state for certain whether it was Johnson. Although Sara admitted that it was difficult to estimate the individual's height because there was no backdrop around the road that would have helped her to judge his height, she agreed that the individual was a little taller than 5'9" but also stated that she did not think that the individual could have been as tall as 6'6". During the trial, Johnson's attorney stated that Johnson was 6'3" tall,[22] and a photo of Johnson attached as an exhibit and the video taken during his interrogation reveals that Johnson is African American.[23]

Finally, the statements Johnson made during his interrogation also link him to the crime. During his interview with the police, which was played for the jury, Johnson admitted that on July 4, he was hanging out with Martinez, Ellison, and Mosby. Further, he admitted that on the night of the shooting, he rode around the VFW in Epperson's car with Martinez that and that they drove on the back roads around the VFW. Johnson also stated that eventually Martinez drove him back to Edwards's house.

Assuming that Edwards was an accomplice witness, the remaining evidence tends to connect Johnson to the crime and corroborates the testimony of Ellison, Martinez, and Edwards. Accordingly, regardless of whether Edwards was an accomplice witness, when viewing the evidence

---

[22] Ramos testified that Johnson is 6'4".

[23] In his testimony, Martinez said that a description of someone who is a "little taller" than 5'9" more accurately describes Ellison rather than Johnson. Martinez also admitted that Ellison had a dark complexion.

in the light most favorable to the verdict, we conclude that a reasonable trier of fact could have found beyond a reasonable doubt that Johnson committed capital murder. Accordingly, the evidence is legally sufficient to support Johnson's conviction. Furthermore, when viewing all of the evidence in a neutral light, we cannot conclude that the evidence supporting the judgment is so weak as to make the jury's verdict clearly wrong or unjust, nor can we conclude that the verdict is against the great weight and preponderance of the evidence. Therefore, the evidence is factually sufficient.

For all of these reasons, we overrule Johnson's first and second issues on appeal.

## CONCLUSION

Having overruled all of Johnson's issues on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: May 28, 2010

Do Not Publish

26